DAVID EUGENE SMITH                    5112-0
Attorney At Law
P.O. Box 390364
Keauhou, Hawaii 96739
Tele: (808) 322-4766
Fax: (866) 372-0361
Email: lodeslaw@yahoo.com

Attorney for Plaintiff
Tiki Shark Art Incorporated

## UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | | |
|---|---|---|
| TIKI SHARK ART INCORPORATED, a Hawaii Corporation | : : : | Case No. 1:13-cv-00577-JMS-RLP (Civil) |
| Plaintiff, | : : | PLAINTIFF'S FIRST AMENDED COMPLAINT |
| vs. | : : | |
| CAFEPRESS, INC., a Delaware Corporation | : : : | |
| Defendant. | : : | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff, TIKI SHARK ART INCORPORATED ("Tiki Shark" or "Plaintiff"), by and through undersigned counsel, brings this case against Defendant, CAFEPRESS, INC. ("CafePress" or "Defendant"), files this Amended Complaint, and alleges, as follows:

## SUMMARY OF THE ACTION

1.      This is an action for copyright infringement and unfair competition arising from the unauthorized use, copying, reproduction, distribution, public display, modification and creation of derivative works of an original painting entitled "Forbidden Island" (the "Work") created by renowned Hawaiian-based Tiki artist, Brad "Tiki Shark" Parker ("Parker") and the

unauthorized use of the image and/or elements thereof shown in the Work, which has acquired secondary meaning in the marketplace as a symbol (the "Symbol"), for Parker and the goods and services offered by Parker through Tiki Shark and its authorized galleries, licensees and distributors, on various infringing goods and services created, marketed, manufactured, and distributed by CafePress. Plaintiff Tiki Shark is Parker's own company having exclusive rights to represent and promote Parker as an artist and to exercise the copyright in and to the Work in order to create, publish, market and commercially exploit original works of art, fine art reproductions and other derivative works of and goods and services based upon the Work and to use the Symbol in conjunction with its business and the goods and services originating therefrom. Upon information and belief, CafePress has copied, modified, reproduced, publicly displayed, created derivative works of and distributed the Work without authorization from Plaintiff. Upon information and belief, CafePress has used the Symbol in commerce in conjunction with its consumer goods (such as towels, flip-flip shoes, mugs and bags) bearing and/or packed in product packaging bearing CafePress' own marks, CAFEPRESS.COM and CAFÉ PRESS (the "CafePress Marks") in a manner that creates a false designation of origin, false or misleading description of fact or false or misleading representation of fact to the public. Inasmuch as Defendant's acts of infringement and unfair competition have damaged Plaintiff's business, the goodwill associated therewith and Plaintiff's reputation, and as Defendant's acts threaten to damage it further, Plaintiff seeks injunctive relief, declaratory relief, and damages for the full amount of Plaintiff's losses or damages, attorneys' fees, and costs.

## JURISDICTION AND VENUE

2.     This is an action arising under the U.S. Copyright Act, 17 U.S.C. § 501, and 1202(b), the Lanham Act, 15 U.S.C. § 1125(a), and the common law of the State of Hawaii.

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1367, and 15 U.S.C. § 1121.

4.     Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(a).

5.     Defendant is subject to personal jurisdiction in Hawaii pursuant to Hawaii Rev. Stat. § 634-35 since the claims set forth below arise from the Defendant's activity, either personally or through an agent,

      i.     Transacting any business within this State; or

      ii.     Committing a tortious act within this State.

## PARTIES

6.     Tiki Shark is a corporation duly organized and existing under the laws of Hawaii, with its principal place of business located at 75-5660 Kopiko St., #C7-423 Kailua-Kona, Hawaii 96740.

7.     CafePress is corporation duly organized and existing under the laws of the State of Delaware and duly registered as a foreign corporation under the laws of the State of California, with its principal place of business located at 1850 Gateway Drive, Suite 300, San Mateo, California 94404. It is being served with this Amended Complaint through its counsel of record.

## FACTS

I.     *Parker is well-known globally for his visually distinctive style lines of Hawaii-based Tiki Art products.*

8.     Parker is a well-known artist globally whose distinctive paintings are synonymous with the Pacific island art form known as "Tiki".

9.     Originally from the mainland, Parker has moved to Hawaii to become an exclusive "Hawaii-based" artist.

10.     Parker's artistic vision has a solid basis in the "Hawaiian Kitsch" style first appearing in the 1940's, 1950's and early 1960's.

11.     This style rests within the boundaries of a larger art movement called "Low Brow Art", which has become extremely popular for collectors and critics. This style takes common Hawaiian or island lifestyle-themes (like Tiki gods and hula dancers) and objects (like surf boards, post cards, beach towels and souvenirs) and, using fine art artistic techniques, strives to raise those "low brow" items up to a level that collectors and critics would call "fine art."

12.     Parker has developed a visually distinct style of "Tiki Art" painting.

13.     Parker fuses a technical quality and splendor of the old Flemish masters with counter-culture subject matter, creating unique works sought after by collectors.

14.     Parker's original artwork and fine art reproductions are high quality selling for thousands of dollars to customers and collectors of Tiki Shark-authorized galleries.

15.     By virtue of his distinct style, the paintings of Parker and other goods created and offered for sale by Tiki Shark have become readily recognizable in appearance by gallery owners, art collectors, trade industry members, "Tiki" enthusiasts and the general public worldwide, and these "Low Brow" art items have commanded heavy interest and higher prices in certain very affluent areas and countries.

**II.     *Parker established Tiki Shark as the exclusive publisher and source of his visually distinctive style lines of Hawaii-based Tiki Art products.***

16.     Parker is the sole owner/stockholder of Tiki Shark, an island-lifestyle company that sells his fine art work and manufactures island living-related products for many high profile companies.

17.     In furtherance of Parker's "Hawaiian Kitsch" artistic vision, Tiki Shark has established two distinct product lines – a Gallery line for the high end buyers of original artwork (starting at $10,000) and fine art giclee reproductions on canvas (starting at $3,000) and original pen & ink drawings (starting at $1,000) (the "Gallery Line"), and a Souvenir line for select "Tiki" or surf/beach resort shops featuring high quality skateboards, surfboards, beach towels and postcards (ranging from $5 to $25 to $100 retail prices) (the "Souvenir Line").

18.     Each line has its own unique price point for products and geographic market.

19.     Each item in a particular line is uniquely selected, created and developed by Tiki Shark in order to further promote Parker's Hawaiian Kitsch style and "Low Brow" art movement.

**III.   *Tiki Shark is very selective as to the image and reputation of its Tiki art lines and its business partners and authorized resellers.***

20.     Tiki Shark also is very selective as to the image of its business partners and licensees who manufacture and/or market high quality goods.

21.     It offers for sale and/or licenses copyrighted works to companies who have an adequate "hipster" style, "Low-Brow" and/or "island life style image" consistent with Parker's reputation.

22.     For example, Tiki Shark shows Parker's artwork from the Gallery Line year-round in the reputable Hawaii-based Wyland galleries located in Kona and Maui, as well as high profile "Low Brow" art galleries located in Los Angeles, Australia and the Middle East, or from Tiki Shark directly.

23.     Tiki Shark offers gallery exhibitions of original art pieces in the Gallery Line regularly at the extremely famous "Low-Brow" art gallery, La Luz De Jesus (known as the home of the Low-Brow Art movement) in Los Angeles, California.

24.     Tiki Shark has been the exclusive licensee for the iconic Body Glove, International, from 2009 to the present, to design their high quality line of beach towels and beach mats.

25.     Tiki Shark further has licensed copyrighted works to the edgy skate board company "Made in Mars" for skate-decks, skim boards and boogie boards in the Souvenir Line.

26.     Tiki Shark even produced locally a retro monster-themed parody series of "postcards from Hawaii" distributed in "Tiki" or souvenir shops and locally in Hawaii at select retail stores (like WalMart and K-Mart) as part of the Souvenir Line.

**IV.    *Tiki Shark's marketing plan promotes Hawaii as the geographic origin of its product lines and Tiki Art as the unique style and art form for Parker and his artistic creations.***

27.     Under this strategic artist plan, Tiki Shark directly advertises to the public that all of Parker's paintings and other goods will be available from or originate solely from the State of Hawaii and Tiki Shark or its authorized distributors.

28.     As a direct result of Tiki Shark's selective marketing and segregated distribution of the Gallery Line and the Souvenir Line and keen attention to quality control, Parker has achieved artistic and commercial success through the promotion and sale of his Hawaiian cultural art and products sold through Tiki Shark.

29.     Tiki Shark's marketing plan targets its advertisements and promotional materials related to Parker and his artwork and goods in "Tiki" or "island life style" magazines, blogs and other online media.

**V.    *As a key part of its marketing plan, Tiki Art has actively promoted Parker and its products using the Symbol.***

30.     In particular, Tiki Shark has actively promoted Parker as an artist using the Symbol.

31.     This Symbol has appeared in numerous publications worldwide, including without limitation, London publisher Korero Publishing's hard cover book listing the top 40 "Out Sider Artists" in the world released April of 2012, Tiki Magazine, Tiki Central blog, and French counter-culture lifestyle/art magazine "Kustom."

32.     The Symbol has been selected for entry into the art contest "Spectrum 16: The Year's Best Contemporary Fantastic Art" (2007).

33.     The Symbol has appeared in Tiki Shark's promotional materials used for gallery events, including a 2012 calendar "Tiki: The Art of Brad Parker" and a 2010 booklet "Tales from the Tiki Lounge".

34.     This Symbol has been featured, with attribution to Parker and Tiki Shark, in the album cover art for the album "Find Forbidden Island" recorded by The Crazed Mugs.

35.     Even the origin of the image comprising the Symbol has been the focal point of Tiki Shark's online media marketing campaigns.

36.     Tiki Shark posted the video of this image being painted by Parker step-by-step online on his art blog "Tiki Central" and, to date, it has achieved a total of approximately 850,007 unique views and counting.

**VI.     *The Symbol has acquired secondary meaning in the marketplace for Parker and his products lines published by Tiki Shark.***

37.     As a result of Tiki Shark's extensive advertising efforts and expenditures, both in print and online media, the Symbol has become synonymous with Parker and Tiki Shark.

38.     In fact, this Symbol has acquired secondary meaning in the marketplace with respect to the art and goods originating from Parker and Tiki Shark.

39.     Tiki Shark has acquired a valuable reputation for quality products and services and other goodwill associated with the Symbol and its business.

**VII.** *Tiki Shark exercises strict quality control over its lines of Tiki art products and their distribution in the relevant markets.*

40.     To maintain the high quality associated with Tiki Shark's business and its goods and services and the Symbol, Tiki Shark has established legitimate and substantial quality control practices and procedures.

41.     These quality control practices and procedures are designed, in part, to maintain the excellent reputation of Tiki Shark and its products, services and valuable goodwill, and the value thereof in each distinct market in which those items are sold or offered for sale to the public.

42.     Tiki Shark exercises strict control over the distribution, handling, manufacturing, marketing and sale of its products in each distinct market for each line.

**VIII.** *Tiki Shark promotes Parker and its lines of Tiki art products on its official website.*

43.     Tiki Shark also hosts and operates an official website www.tikishark.com (the "Tiki Shark Website") on which it advertises and markets certain consumer goods and otherwise markets and promotes Parker and his two separate product lines.

44.     Tiki Shark has extensively promoted, displayed and offered for sale Parker-created artwork and goods through the Tiki Shark Website and the Internet to the public.

45.     In particular, the Work is displayed in the gallery of the Tiki Shark Website.

**IX.** *Parker created the copyrighted Work infringed by CafePress, and Tiki Shark owns the copyright in this Work.*

46.     Parker created the Work in 2007.

47.     This work of authorship was first fixed in the tangible medium of an original acrylic painting.

8

48.     This original painting of the Work was signed by Parker and each reproduction thereof created by Tiki Shark bears Parker's signature, name and/or copyright notice for Forbidden Island by Brad "Tiki Shark" Parker, © 2007.

49.     The image below reflects an accurate reproduction of the Work and the Symbol:



50.     The image below shows Parker in the process of creating the Work in 2007:



51.     Tiki Shark owns valid copyrights in the Work.

52.     Tiki Shark has filed applications for registration of the copyright prior to the institution of this action in compliance with 17 U.S.C. § 411, including Copyright Office Case

No. 953703501 filed June 23, 2013 for the visual work entitled "Art of Brad Tiki Shark Parker: Forbidden Island" and Copyright Office Case No. 953708421 filed June 22, 2013, for other works entitled "Art of Brad Tiki Shark Parker: numbers 1-75.

53.     Tiki Shark owns the exclusive rights to copy, reproduce, publicly display, create derivative works of, and distribute all of Parker's works of authorship, including the Work at issue in this case, as well as the right to sue for infringement of these rights.

54.     Tiki Shark further owns exclusive rights in the Symbol and it has a priority of use of the Symbol since as early as 2007 for the goods and services offered by Tiki Shark.

**X.      CafePress operates the CafePress Website.**

55.     Upon information and belief, CafePress operates its CafePress Marketplace www.cafepress.com (the "CafePress Website").

56.     CafePress admits on its CafePress Website that "CafePress in its sole and absolute discretion . . . determine[s] what designs and products will be available through the CafePress Marketplace."

57.     If products are made eligible for the Marketplace, CafePress admits on its website that "CafePress may automatically modify designs (e.g., cleaning up JPG artifacting, adjusting colors for different printers and products, and adjusting design placement on products)."

58.     CafePress also determines the retail price for products sold in its Marketplace.

59.     If online shoppers want to buy an item from the Marketplace, they pay CafePress directly, then CafePress pays commissions to others.

60.     In addition to sales through its CafePress Marketplace, CafePress also has sold through "feeds" including feeds to Amazon.com and eBay.com.

61.     This "feed" method involves CafePress' marketing department providing content to Amazon and eBay regarding certain products, which are then sold through those companies.

62.     To aid in its sales, CafePress contracts with a company that provides "retargeted" advertising.

63.     Visitors to the CafePress Website receive online Internet advertising that depict images viewed on the CafePress Website.

64.     On information and belief, the Work was used by CafePress in advertising.

65.     On information and belief, the revenues to CafePress from retargeted advertising exceed the amount that CafePress spent on such advertising.

66.     On information and belief, CafePress and third parties have documents that show the effectiveness of retargeted advertising.

67.     CafePress also admits on the CafePress Website: "CafePress.com uses many state of the art technologies to produce the items we sell."

68.     Once products are ordered, most are printed by CafePress at its "state-of-the-art" production facility in Kentucky.

69.     CafePress boasts on its CafePress Website: "Measuring more than three football fields, this facility has hundreds of state-of-the-art printing presses perfectly matched for the 250+ products we print."

70.     Upon information and belief, CafePress under its brand cafepress.com creates, markets and sells products (such as towels, flip-flops, bags, mugs, t-shirts and hats) using its proprietary "World's Customization Engine" platform on the Internet through the CafePress Website and other websites containing design elements probatively and substantially similar to design elements contained in Plaintiff's copyrighted designs.

71.     Upon information and belief, CafePress under its brand CanvasOnDemand creates, markets and sells canvas works of art on the Internet through the CafePress Website and/or links thereon using its proprietary platform.

72.     Upon information and belief, CafePress under its brand Imagekind provides an art gallery on the Internet through the CafePress Website and/or links thereon using its proprietary platform.

**XI.    *CafePress' commercial activities go well beyond storage of user content by an online service provider.***

73.     Upon information and belief, CafePress does not merely store content at the direction of its users on the CafePress Website.

74.     Upon information and belief, CafePress determines, in its sole and exclusive discretion, whether any content compliance with its instructions and is satisfactory for use with its online service.

75.     Upon information and belief, CafePress creates unique custom products.

76.     Upon information and belief, CafePress operates the CafePress Marketplace and 2 million shops where its customers can choose from over 300 million products.

77.     Upon information and belief, CafePress categorizes products by key words commonly known to consumers for product searching on the search engine on their website.

78.     Upon information and belief, CafePress assigned the key word "Tiki Art" or "Tiki Art Gifts" to the products at issue in this case.

79.     Upon information and belief, CafePress makes sales and processes orders from the public for all of the custom products offered for sale on the CafePress Website.

80.     Upon information and belief, CafePress handles all returns and exchanges for all of the infringing products offered for sale on the CafePress Website.

81.     Upon information and belief, CafePress offers 100% money back guarantee on all products – it backs all orders shipped to the public with its own customer satisfaction guarantee.

82.     Upon information and belief, CafePress offers a dedicated telephone line and call center whereby the public can call and place orders for all of the custom products offered for sale on the CafePress Website.

83.     Upon information and belief, CafePress packs the infringing products in product packaging bearing the CafePress Marks.

84.     Upon information and belief, CafePress handles the billing, payment and invoice processing for each product ordered by a customer from the CafePress Website or other linked sites.

85.     Upon information and belief, CafePress inserts its CafePress-branded invoice into each CafePress Mark-branded product package to be shipped to the consumer.

86.     Upon information and belief, these product packaging and invoices bear no marks or source identifiers other than the CafePress Marks and the Symbol.

87.     Upon information and belief, CafePress includes a photograph of the product on each order confirmation email and each shipping packing slip sent to each customer who places an order.

88.     Upon information and belief, CafePress handles the shipping and handling of all customer products purchased by the public on the CafePress Website.

89.     Upon information and belief, CafePress offers gift certificates towards the purchase of any of the products offered for sale on the CafePress Website.

90.     Upon information and belief, CafePress establishes the prices for all products offered for sale on the CafePress Website.

91.     Upon information and belief, CafePress authorizes others to be promoters and/or resellers of all of the custom products offered for sale on the CafePress Website.

92.     Upon information and belief, CafePress provides content via a feed to several large international online vendors (including Amazon and eBay) from which the custom products selected by CafePress are offered for sale to the public on those vendor's websites.

**XII.   *CafePress' commercial activities caused numerous infringements of Tiki Shark's copyright in the Work in violation of U.S. copyright laws.***

93.     Upon information and belief, prior to May of 2013, CafePress permitted a copy of the Work to be uploaded to the CafePress Website.

94.     Upon information and belief, CafePress stored a copy of the Work on its servers and platform and publicly displayed the Work on the CafePress Website.

95.     Upon information and belief, the name and signature of Parker and/or copyright notice from the Work was removed from the copies of the Work on the CafePress Website.

96.     Upon information and belief, CafePress modified the Work by resizing and/or splitting in two the Work in order to fit the image shown in the Work onto certain beach-related custom products, including without limitation, flip flop shoes and bags.

97.     Upon information and belief, CafePress created derivative works of the Work for use in conjunction with the manufacturing of each customer product offered on the CafePress Website.  Each product constitutes a separate infringement.

98.     Upon information and belief, CafePress offered for sale to the public at least 218 custom products copying the Work and bearing the Symbol.

99.     Upon information and belief, CafePress denoted each of these 218 custom products as "Tiki Art Gifts" for use in their product search engine and their feeds whereby customers can search for relevant products by the key word "Tiki" or "Tiki Art."

100.    Upon information and belief, CafePress processed orders from customers in the general public to purchase these custom products copying the Work and bearing the Symbol.

101.    Upon information and belief, CafePress packaged these custom products copying the Work and bearing the Symbol in product packaging bearing only the CafePress Marks (and not any mark, name, moniker or avatar of others using the CafePress Website).

102.    Upon information and belief, CafePress permitted others to market, promote and sell the custom products copying the Work and bearing the Symbol on websites, social media and media other than the CafePress Website, including without limitation, large international online vendors Amazon and eBay.

103.    Upon information and belief, CafePress received actual monies and other benefits and gains in the form of sales and advertising revenue from the copying, reproduction, public display, distribution, creation of derivative works of and modification of the Work and the use of the Symbol.

**XIII.** ***CafePress' commercial activities were performed without license or authorization from Tiki Shark.***

104. All of the CafePress' activities were performed without license or authorization from Tiki Shark.

105. Café Press copied the Work and used the Symbol without Tiki Shark's permission in conjunction with a variety of its CafePress-branded clothing and accessory products.

106. In most instances, this is a case of literal infringement in that these are exact copies or cropped derivatives of exact copies of the Work and the Symbol.

107. Café Press sold these products with the Work copied and the Symbol applied to them and shipped them to Hawaii and other states and countries in Café Press branded packaging.

108. There were at least 218 different products with the Work copied and the Symbol applied to them.

109. Tiki Shark first became aware of these infringing products on or about May of 2013.

110. For reference, Tiki Shark purchased the following two infringing products directly from CafePress:

a.  *Flip Flops*



b.  *Dopp Kit*



**XIV.**  ***Tiki Shark has incurred actual damages and loss of business directly related to or proximately caused by CafePress' infringing commercial activities.***

111.    Tiki Shark has been the exclusive licensee for the iconic Body Glove, International, from 2009 to the present, to design their high quality line of beach towels and beach mats.

112.    Under this exclusive arrangement, Tiki Shark manufactures and sells beach towels and beach mats featuring "Tiki" artwork designed by Parker to Body Glove for commercial resale to the public.

113.    TIKI STYLE ME - JLT is an Emirati company that operates out of the exclusive high end JLT zone and that distributes Tiki style products through its affiliate Body Glove International.

114.    On or about May of 2013, TIKI STYLE ME - JLT placed an order with Tiki Shark for over 25,000 beach towels featuring the Work and bearing the Symbol valued at US $257,728.00.

115.    TIKI STYLE ME - JLT placed this order for this particular beach towel featuring the Work and the Symbol, in part, because of their public association in the marketplace with Parker and his Hawaiian-based Tiki art.

116.    Following the submission of a purchase order to Tiki Shark, TIKI STYLE ME - JLT canceled the order because it had discovered the Work being copied and publicly displayed on the CafePress Website and the Symbol being used on mass-market consumer products offered for sale on the CafePress Website by CafePress.

**XVIII.**     ***CafePress' commercial activities constitute acts of unfair competition under the Lanham Act, 17 U.S.C. Section 1125.***

117.    Upon information and belief, CafePress used the Symbol in connection with goods sold in commerce.

118.    Upon information and belief, CafePress used the Symbol as a device, or as a designation of origin, or as a description or representation in connection with goods and containers for goods in commerce.

119.    Upon information and belief, CafePress' use of the Symbol in this manner was false or misleading in that CafePress' use suggested to the public that Parker and Tiki Shark were associated with or endorsed CafePress' products.

120.    Upon information and belief, CafePress further used product packaging bearing the CafePress Marks for the Symbol-related products.

121.    Parker and Tiki Shark have never been associated with or endorsed CafePress or CafePress' products.

122.    Parker and Tiki Shark have not authorized anyone to upload the Work to the CafePress Website or to make any derivative works or copies thereof

123.    Parker and Tiki Shark have not granted to CafePress a license to copy any works (or copies thereof) created by Parker, including without limitation, the Work, or to use the Symbol in conjunction with any of the infringing custom products offered by CafePress on the CafePress Website.

124.    Upon information and belief, CafePress' use of the Symbol on its goods is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Parker and Tiki Shark with Café Press.

125.    Upon information and belief, Café Press' use of the Symbol on its goods is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of CafePress' products by Parker and Tiki Shark.

126.    Tiki Shark possesses the priority of use of the Symbol for consumer products offered on the Internet.

127.    Upon information and belief, CafePress advertises, offers for sale and distributes to the public on the CafePress Website and via a feed to other websites (such as Amazon and eBay) consumer goods that are substantially similar to the goods advertised, offered for sale and/or distributed by Tiki Shark on the Tiki Shark Website and to the public, including without limitation, towels and canvas art work, using the CafePress Marks.

128.    In particular, CafePress sold beach flip-flops bearing the Symbol under the CafePress Marks.

129.    One of the important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the owner's mark or symbol.

130.    In the present case, CafePress is believed to be passing off its goods in a manner that shows sponsorship, origin or affiliation from Tiki Shark.  These CafePress goods, however, are not genuine goods.

131.    In addition, these CafePress goods are of low quality and generic and are packaged in a way that renders the goods inferior.

**XIV.**  ***CafePress is liable for vicarious and/or induced infringement by virtue of its commercial activities using the "World Customization Engine" platform.***

132.    Upon information and belief, CafePress is liable for direct, vicarious, and/or induced infringement by assisting others in their infringement of the copyright of the Work on the CafePress Website by providing its customization engine platform and related CafePress Marketplace services.

133.    Upon information and belief, CafePress is the sole creator, owner and operator of its "World's Customization Engine" available to the public on the CafePress Website and this automated platform was not created or developed at the direction of anyone using the CafePress Website.

134.    Upon information and belief, CafePress has selected all of the features and functionality for, and services offered on, its World's Customization Engine available to the public on the CafePress Website, and this robust platform was not created or developed at the direction of anyone using the CafePress Website.

135.    For the reasons stated above in this Complaint, CafePress controls this platform and all of its activities conducted using this platform and/or the CafePress Website, as well as the CafePress Marketplace with 2 million shops offering over 300 million products to the public using this platform.

136.    Upon information and belief, CafePress ships over 6 million products annually and has over 11 million unique visitors to its CafePress Website each month using this platform.

137.    Upon information and belief, this robust platform and the CafePress Marketplace allows for any product to be readily marketed and offered to the public worldwide, including without limitation, the United States, Australia, Canada, France, Germany, Spain, and the United Kingdom.

138.    Upon information and belief, CafePress uses this platform to automatically provide content for its custom product sales to other large international online vendors and sites (such as Amazon and eBay).

139.    Upon information and belief, CafePress requires no fees or charges upfront for anyone to shop or open a shop on the CafePress Website or to load any content to the CafePress Website, and does not require anyone to pay for use of this platform and/or the CafePress Marketplace for general services – in short, it is free to set up, access and use.

140.    With no costs being incurred, there is no barrier to market entry and there are easy monetary rewards with no risks for a few key strokes of nominal effort to anyone by virtue of their infringing use of this robust platform.

141.    Upon information and belief, CafePress did not build into this platform any filtering mechanisms to reduce infringement by anyone using its CafePress Website.

142.    It is this robust platform that fosters copyright infringement by anyone using this platform and CafePress of the kind described in this Complaint, which damage businesses like Tiki Shark and diminish the value of copyrighted works of art such as the Work at issue in this case.

**XV.    *CafePress should be held responsible for all of its commercial activities using the "World Customization Engine" platform and its CafePress Website.***

143.    Furthermore, upon information and belief, anyone using the CafePress Website typically uses avatars and/or monikers to identify themselves, and not their real names or addresses, on a CafePress shop or the CafePress Marketplace.

144.    The true copyright owner of an infringed work does not have access to the name and contact information of anyone who may have posted, copied or distributed the infringing materials without first filing a DMCA complaint and/or subpoena to CafePress, in order to seek damages, even after the infringed copyright has been distributed throughout the world by CafePress using this automated platform and the CafePress Marketplace.

145.    It is CafePress' position that the copyright owner must seek damages for all activities of infringement conducted using its platform and the CafePress Website solely from others, and not CafePress, irrespective of where those others are physically located worldwide and regardless of the fact that the infringements arise from this platform and the CafePress Website operated by CafePress at its own direction, because CafePress is immunized from liability by the Section 512(c) of the DMCA Safe Harbor, Section 230 of the Telecommunications Decency Act and/or 15 U.S.C § 1114(2)(A).

146.    For the reasons state above in this Complaint, these immunities and/or defenses are not applicable to the CafePress services offered using this platform and the CafePress

Website, and CafePress should be held accountable for its infringing activities, as described in this Complaint.

**XVI.** ***Tiki Shark's business has and will continue to incur damages and loss of business by virtue of CafePress' commercial activities in violation of U.S. copyright and unfair competition and state common law.***

147.   Upon information and belief, Tiki Shark believes that CafePress' actions have caused or will cause damage to the reputation of Parker and the goodwill of the business operated by Tiki Shark and its products and services, and has or will materially adversely impact the sales and/or valuation of its Gallery Line of original works of art and fine art reproductions and its Souvenir Line of products.

148.   Tiki Shark and its authorized galleries sell original works of art and final art reproductions created by Parker to collectors who pay thousands of dollars, in part, because the works are original and not reproduced (other than in limited edition fine art reproductions in the Gallery Line or limited edition "Low Brow" art items in the Souvenir Line).

149.   Tiki Shark has received at least 70 documented inquiries and comments from collectors who are concerned about the loss in value of their fine art reproduction of the Work based on CafePress' actions alleged in this complaint.

150.   Any loss of a collector and/or the artist gallery representation by a gallery would result in significant loss of monetary revenue and market value of Parker's works to Tiki Shark.

151.   Tiki Shark further has lost actual orders for products in its Souvenir Line based on CafePress' actions alleged in this complaint, as stated above.

## COUNT I

## COPYRIGHT INFRINGEMENT

152.    Plaintiff incorporates by reference paragraphs 1 to 151 as if set forth herein.

153.    The Work owned by Plaintiff is entitled to protection under the copyright laws of the United States.

154.    By means of the actions complained in this complaint, Defendant has infringed and will continue to infringe Plaintiff's copyright in and to the Work by copying, reproducing, publicly displaying, creating derivative works of, modifying, and distributing the Work, and derivative works and/or modifications thereof, on or in conjunction with certain goods and materials (or portions thereof) created, marketed, packaged and distributed by Defendant to the general public, or induced, assisted, directed or conspired in, or been vicariously or secondarily liability for such actions, in violation of 17 U.S.C. § 501.

155.    On information and belief, Defendant's infringement is not limited to the copyrighted design of the Work.

156.    On information and belief, the artist(s) or other person(s) responsible for providing Plaintiff's above listed copyrighted designs to Defendant also provided additional infringing designs. Plaintiff will identify such additional infringing designs after discovery into all designs submitted by such artist(s) and all marketing and sales materials used by Defendant.

157.    Plaintiff is entitled to an injunction restraining Defendant and its partners, agents, users, and all other persons in active concert or participation with them from engaging in further such acts in violation of the copyright laws of the United States.

158.     As result of such infringement, Plaintiff seeks all remedies available to it, pursuant to the Copyright Act, including, but not limited to:

    a.  Seizure, impoundment and/or destruction of all of the products used to perpetrate the infringing acts pursuant to 17 U.S.C. §503.

    b.  Actual damages suffered by Plaintiff as a result of the infringement pursuant to 17 U.S.C. §504 (b).

    c.  Any profits of Defendant that are attributable to the infringement and are not taken into account in computing the actual damages pursuant to 17 U.S.C. §504 (b).

    d.  Statutory damages (at Plaintiff's election) instead of actual damages and profits, for all infringements involved in the action, with respect to any one work, for which any one defendant is liable individually, or for which Defendant is liable jointly and severally with another, in a sum of not less than $ 750 or more than $30,000 as the court considers just pursuant to 17 U.S. C. §504(c)(1); and, to the extent the court finds that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $ 150,000 per violation, pursuant to 17 U.S.C. §504(c)(2).

159.     Plaintiff is unable to ascertain at this time the full extent of the gains, profits, advantages that Defendant has obtained by reason of their aforesaid acts of copyright infringement.

## COUNT II

**FALSIFICATION OR REMOVAL OF COPYRIGHT INFORMATION**

160.    Plaintiff incorporates by reference paragraphs 1 to 151 as if set forth herein.

161.    Defendant who had direct access to the Work, without authorization, removed Parker's name or signature before copying the Work.

162.    Parker's name or signature is copyright management information ("CMI") as defined in 17 U.S.C. § 1202(c).

163.    The CMI for the Work has been removed intentionally by Defendant and without Parker's or Tiki Shark's authority.

164.    Defendant removed the CMI knowingly, or having reasonable grounds to know, that it will induce, enable, facilitate or conceal infringement in violation of 17 U.S.C. § 1202(b).

165.    On information and belief, CafePress falsely claimed copyright to the Work on certain products with the intent to induce, enable, facilitate or conceal infringement and further distributed products with this false copyright management information.    On information and belief, the false copyright management information includes: "© CafePress, Inc."

166.    Tiki Shark has been damaged as a direct result of Defendant's actions.    The amount of damages cannot be determined at this time.

167.    Plaintiff is unable to ascertain at this time the full extent of the gains, profits and advantages that Defendant has obtained as a result of its unlawful conduct.

168.    As a result of the acts described above, Plaintiff is entitled to permanent injunctive relief to enjoin Defendant's acts, to recover its damages and Defendant's gains, profits and advantages obtained as a result of the acts alleged above and to recover damages in an amount to be determined.

## COUNT III

## LANHAM ACT SECTION 43(a)

169.    Plaintiff incorporates by reference paragraphs 1 to 151 as if set forth herein.

170.    Defendant's actions and conduct violate 15 U.S.C. § 1125(a) in that it has used, induced the use, conspired in using, and/or vicariously used in connection with goods and services a false designation of origin and a false description or representation, including words or other symbols tending falsely to describe or represent the same and has caused such goods to enter into commerce.

171.    Plaintiff believes that it has been, is and is likely to be damaged by such false descriptions and representations given the likelihood that the public will be deceived as to the true source, sponsorship or affiliation of Defendant's goods.

172.    By misappropriating and using the Symbol, Defendant misrepresents and falsely describes to the general public and trade the origin and source of its products and creates a likelihood of confusion as to the source, geographic origin and sponsorship of such products.

173.    By affixing the CafePress Marks to all product packaging and invoices for the Symbol products, Defendant misrepresents and falsely describes to the general public and trade the origin and source of its products and creates a likelihood of confusion as to the source, geographic origin and sponsorship of such products.

174.    Moreover, Plaintiff has no control over the quality of the products offered by Defendant and, therefore, the sale thereof damages Plaintiff, dilutes the goodwill of the Symbol and Plaintiff's business in which the Symbol is used and damages the reputation that Plaintiff has

developed in connection with the sale of genuine goods and services offered in connection with the Symbol by Plaintiff.

175. Defendant's use of the Symbol was without authorization or consent of Plaintiff.

176. The products sold by Defendant are of the same general nature and type as certain genuine goods using the Symbol by Plaintiff, and as such Defendant's use is likely to cause confusion among the trade and the purchasing public.

177. Defendant's use of the Symbol in connection with the advertising and sale of its products also is likely to cause and has caused irreparable harm to Plaintiff, including but not limited to determent and diminution in value of the Symbol and the art business of Plaintiff.

178. Defendant's unlawful, unauthorized and unlicensed manufacture, offer for sale and distribution of products using the Symbol creates the express and implied misrepresentations that such products were created, authorized or approved by Plaintiff.

179. Defendant's prominent branding of the packaging of these products using the Symbol with its own CafePress Marks and its marketing representations further creates strong likelihood of confusion among the trade and the purchasing public and has caused irreparable harm to Plaintiff.

180. Defendant's wrongful acts have interfered with Plaintiff's ability to conduct its business and have proximately caused and will continue to cause Plaintiff substantial injury, including loss of customers, dilution of its goodwill, confusion for potential customers, injury to its reputation and diminution of value of its rights in the Symbol.

181.     This conduct by Defendant has created and will create confusion among members of the general public, and will cause irreparable and immediate injury to Plaintiff for which Plaintiff has no adequate remedy at law.

182.     By reason thereof, Plaintiff has sustained substantial monetary injuries, loss and damages, and will sustain further irreparable injury and damage if these wrongful acts are not enjoined or otherwise prevented.

183.     The amount of Plaintiff's damages cannot be determined at this time.

184.     Plaintiff is unable to ascertain at this time the full extent of the gains, profits and advantages that Defendant has obtained as a result of its unlawful conduct.

185.     As a result of the acts described above, Plaintiff is entitled to permanent injunctive relief to enjoin Defendant's acts, to recover its damages and Defendant's gains, profits and advantages obtained as a result of the acts alleged above and to recover damages in an amount to be determined.

## COUNT IV

## COMMON LAW UNJUST ENRICHMENT

186.     Plaintiff incorporates by reference paragraphs 1 to 151 as if set forth herein.

187.      Defendant has used the Symbol in connection with advertising and sale of goods and services within the State of Hawaii and elsewhere in the United States and other countries worldwide with no consideration or payment to Plaintiff.

188.     Defendant's actions have caused and continue to cause injury to Plaintiff.   In contrast, Defendant has received profits and other benefits from its advertising and sale of goods through its use of the Symbol.

189.   To the extent that those profits and benefits were or are being generated through Defendant's improper use of the Symbol, Defendant has been unjustly enriched, and will continue to be unjustly enriched, at Plaintiff's expense in an amount to be determined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and/or orders, as follows:

a)   That Defendant be held to have infringed, directly or otherwise, Plaintiff's copyrights.

b)   That Defendant be required to account for all gains, profits and advantages derived from each of its infringements of Plaintiff's copyrights and to pay plaintiff such damages as Plaintiff has sustained in consequence of Defendant's infringements, or such damage as to this court shall appear proper within the provisions of the Copyright Law, including, without limitation, statutory damages up to $150,000 per violation in an amount no less than $150,000 based on at least one (1) infringing work that infringes at least one (1) of Plaintiff's copyrights.

c)   That all of the products used to perpetrate the infringing acts be seized, impounded and destroyed.

d)   That a preliminary and permanent injunction issue restraining and enjoining Defendant, and Defendant's officers, agents, attorneys, directors, employees and those acting in privity or in concert with them, from directly or indirectly using, in any fashion, any of Plaintiff's copyrighted works.

e)   That all gains, profits and advantages derived by Defendant from their acts of infringement and other violations of law be deemed to be held in constructive

trust for the benefit of Plaintiff to avoid dissipation and/or fraudulent transfers of such monies by Defendant.

f) That Defendant be ordered to pay compensatory damages.

g) That Defendant pay to Plaintiff his costs of this action, expenses, and reasonable attorney's fees.

h) That Defendant pay to Plaintiff prejudgment interest.

i) That Defendant be required to account for damages, attorneys' fees and costs for false designation of origin, false or misleading description of fact or false or misleading representation of fact in violation of the Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

j) That Defendant be required to account for damages, attorneys' fees and cost for unjust enrichment in violation of the common law of the State of Hawaii.

k) That a preliminary and permanent injunction issue restraining and enjoining Defendant and Defendant's officers, agents, attorneys, directors, employees and those acting in privity or in concert with them, from directly or indirectly using, in any fashion, the Symbol or from engaging in any conduct or course of conduct likely to enable Defendant to benefit from the valuable goodwill and hard-earned reputation established by Plaintiff.

l) That an order be issued requiring Defendant and its officers, agents, attorneys, directors, employees and those acting in privity or in concert with them, to deliver for destruction all articles of merchandise, tools, designs, files, advertisements, packing and any other materials in their possession, custody or control that bear the Symbol.

m) That an order be issued requiring Defendant and its officers, agents, attorneys, directors, employees and those acting in privity or in concert with them, to account for all profits and benefits arising from Defendant's use of the Symbol and a judgment awarding to Plaintiff an amount reflecting Plaintiff's damages and/or Defendant's profits, whichever is greater, with such damages to be increased as the court finds to be just under the circumstances of this case.

n) That an order be issued ruling that Defendant is not immune from liability under Section 512(c) of the DMCA Safe Harbor from injunctive relief and monetary damages for infringement of copyright by reason of any and all online services offered or performed by Defendant, as described in this Complaint, and none of these services are by reason of storage at the direction of a user of material on a system or network operated by Defendant.

o) That an order be issued ruling that Defendant is not immune from liability under Section 230 of the Telecommunications Decency Act because Defendant is an information content provider with respect to any and all online services offered or performed by Defendant, as described in this Complaint.

p) That an order be issued ruling that Defendant is not eligible for the printer defense under 15 U.S.C. §1114(2)(A) because Defendant's activities are not engaged solely in the printing of a mark or materials for others, as described in this Complaint.

q) That an order be issued awarding damages in an amount necessary to compensate Plaintiff for its losses caused by Defendant's actions described in this Complaint, including the diminution in value of the Symbol, the business of Tiki Shark and

the goodwill associated therewith, and the reputation of Parker and any other damages to which Plaintiff may be entitled.

r)   For such other and further relief to which it may be justly entitled and/or as the Court deems necessary or appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

DATED:   March 3, 2014

> David Eugene Smith
> Attorney At Law, LLLC
> P.O. Box 390364
> Keauhou, Hawaii 96739
> Tele: (808) 322-4766
> Toll Free Fax: (866) 372-0361
> lodeslaw@yahoo.com
>
> By: /s/ David Eugene Smith
> David Eugene Smith
> Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served electronically on the following through CM/ECF on March 3, 2014.


PAUL MAKI Attorney At Law
Email: pmaki@makilaw.com

- and -

GREENBERG TRAURIG, LLP
Ian C. Ballon (*Pro hac vice*)
Email: ballon@gtlaw.com
Lori Chang (*Pro hac vice*)
Email: changl@gtlaw.com


Attorneys For Defendant
Café Press, Inc.


DATED: Kailua Kona, Hawaii, March 3, 2014


By: /s/ David Eugene Smith
David Eugene Smith